In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3613

Pravin Sanghvi, M.D.,

Plaintiff-Appellant,

v.

St. Catherine's Hospital, Inc., f/k/a
Lakeshore Health System, Inc., and
St. Mary Medical Center, Inc.,

Defendants-Appellees.

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:98-CV-202-TS--Theresa L. Springmann, Magistrate Judge.

Argued May 7, 2001--Decided July 3, 2001


   Before Flaum, Chief Judge, and Ripple and
Diane P. Wood, Circuit Judges.

   Flaum, Chief Judge.  Dr. Pravin Sanghvi
appeals the adverse grant of summary
judgment on his 42 U.S.C. sec. 1981 claim
against St. Catherine's Hospital./1 The
plaintiff contends that he has produced
sufficient direct and indirect evidence
of discrimination to warrant a jury
trial. For the reasons stated herein, we
affirm the district court's decision.

I.  Background

   Dr. Sanghvi, who is dark-skinned and of
Asian-Indian ethnicity, is an
obstetrician/gynecologist licensed in
Indiana. In 1994, he began covering the
practice of Dr. A. P. Bonaventura located
at St. Mary Medical Center, which is
affiliated with St. Catherine's Hospital,
whenever Dr. Bonaventura was unavailable.
When he covered the practice, Dr. Sanghvi
billed the patients under his own name
and provider number.

   In October, 1996, Dr. Bonaventura sold
his practice to the defendant, which was
then known as Lakeshore Health System.
After this sale, Dr. Bonaventura received
a salary from the defendant and no longer
had the authority to bill patients
directly; rather, the defendant charged

his patients for his services. Dr. Sanghvi continued to fill in for Dr. Bonaventura. Dr. Sanghvi was aware that Dr. Bonaventura no longer charged patients himself, and the defendant told Dr. Sanghvi that he would be paid an hourly wage for covering the practice, though apparently no amount was agreed upon. However, the plaintiff continued to bill the patients directly under his own name and provider number. While Dr. Bonaventura knew this, the executives of St. Catherine's did not.

Dr. Bonaventura's declining health prevented him from continuing to perform his duties in May, 1997. On June 11, 1997, the chief executive officer of St. Mary Medical Center, Milton Triana, met with Dr. Sanghvi, who expressed an interest in purchasing Dr. Bonaventura's practice if he were unable to return. Once Dr. Bonaventura's inability to resume treating patients became a certainty, which was apparently a few days later, Triana offered to sell the assets to either Dr. Sanghvi or another physician who regularly covered the practice.

On June 19, Triana met with Dr. Sanghvi to discuss the sale of the practice. At this meeting, Triana asked Dr. Sanghvi: "Being an older, foreign-born physician, how comfortable do you feel dealing with young, white American women?"/2 Triana also told Dr. Sanghvi that the hospital did not want to finance the purchase of the practice.

The next day Triana wrote a letter offering to sell Dr. Sanghvi the practice for $360,000, payable in full at closing. This letter also indicated the defendant's expectation that the plaintiff would recruit another obstetrician/gynecologist to provide greater depth of coverage, though this was not a requirement of the sale. The number of women treated by the practice was important to the defendant because it expected that these patients would be referred to it by whomever purchased the practice. On June 24, Dr. Sanghvi responded with a counteroffer of twenty percent of the gross collection of the practice for the first year after he took over, to be paid monthly. This was rejected by the defendant. That same evening, Dr. Sanghvi and Triana had a

discussion where the doctor offered to pay $250,000 for the practice in monthly installments over a one-year period. If Dr. Sanghvi failed to deliver the purchase price within the year, then any the payments he had made would be refunded. Triana seemed favorably inclined towards this arrangement, but said that he had to run it by a committee. Dr. Sanghvi made the same offer in writing on June 25. The defendant eventually rejected this offer.

Around this same time, in mid-to-late June, the Women's Wellness Center ("WWC") entered the picture. WWC employed a group of physicians, who were all white men, and its president at the time was Jeffrey Yessenow. A representative of WWC contacted the defendant about buying the practice. St. Catherine's responded that it would sell the practice for $360,000, with no financing by the hospital. In early July, the agents of the defendant and WWC began negotiations. Triana and other officers of St. Catherine's met with Dr. Sanghvi on July 1, informing him that they intended to sell to WWC since they were paying cash, but if that deal fell through they would accept Dr. Sanghvi's June 25 offer. On July 3, a letter of intent expressing the broad terms of the sale agreement between the defendant and WWC was drawn and executed. They settled on a purchase price of $250,000, to be paid in full at closing. However, over the coming months WWC continued to ask St. Catherine's to consider a lower price. On July 7, Dr. Sanghvi was told that the practice had been sold.

Dr. Sanghvi sent a letter dated August 2 to some of Dr. Bonaventura's former patients, purporting to explain why he did not take over the practice. The letter stated that Dr. Bonaventura's practice was simply sold to the higher bidder without regard for any other considerations. The letter went on to state that many of Dr. Bonaventura's old patients were coming to Dr. Sanghvi's office, and asked the recipients of the letter to share it with any of Dr. Bonaventura's former patients. Around the same time, Triana discovered that Dr. Sanghvi had billed Dr. Bonaventura's patients directly after the defendant purchased the practice. This allegedly diverted $38,000 of receivables belonging

to the defendant to Dr. Sanghvi.

In part because of these events, by late September or early October the defendant acquiesced in a price reduction for WWC to $125,000. WWC then gave St. Catherine's a check for $50,000 with the remainder to be paid when the paperwork was formally completed, though the defendant claimed this check was accidentally destroyed. On November 1, WWC took over Dr. Bonaventura's practice.

Dr. Sanghvi and Triana spoke by telephone on November 6. When Triana told Dr. Sanghvi that the price WWC was paying for the practice was less than $200,000 and a final agreement had not been signed, Dr. Sanghvi offered to purchase the practice outright for up to $200,000 in cash. Triana did not respond. On January 5, 1998, St. Catherine's and WWC executed an asset transfer agreement and WWC paid the $125,000 purchase price in full.

Dr. Sanghvi brought suit in state court against the current defendant and others, alleging a violation of 42 U.S.C. sec. 1981 and various state law claims. The defendant removed the case to federal court based upon federal question jurisdiction and brought a counterclaim seeking damages under state law for Dr. Sanghvi's directly billing the practice's patients. The defendant moved for partial summary judgment on all of Dr. Sanghvi's claims. The district court granted the motion on the sec. 1981 cause of action and some of the state law claims. The court found that Dr. Sanghvi had not presented any direct evidence of discrimination and could not demonstrate that the defendant's reasons for refusing to sell the practice to him were pretextual. Having disposed of the federal claim, the district court remanded the remaining state laws claims to state court.

II.  Discussion

42 U.S.C. sec. 1981 prohibits intentional discrimination on the basis of race or ethnicity concerning an activity protected by the statute. Saint Francis College v. Al-Khazraji, 481 U.S. 604, 613 (1987). Making a contract is such a protected activity, and Dr. Sanghvi claims that the defendant refused

to sell him Dr. Bonaventura's practice assets because of the plaintiff's race. Dr. Sanghvi can proceed under either the conventional method of proof or under the burden-shifting method, Von Zuckerstein v. Argonne Nat'l Lab., 984 F.2d 1467, 1472 (7th Cir. 1993), and he has elected to use both. Our review of the district court's grant of summary judgment is de novo. Id. at 1471.

A. Conventional Method

Dr. Sanghvi argues that Triana's question during their June 19 conversation--"Being an older, foreign-born physician, how comfortable do you fell dealing with young, white American women?"--constitutes direct evidence of discriminatory intent. Dr. Sanghvi contends that when this interrogatory is combined with circumstantial evidence, such as that the defendant rejected his November 6 offer to pay more money than WWC and that WWC was allowed to take over the practice without paying the full purchase price, he has made a sufficient case to reach a jury. St. Catherine's disputes the characterization of Triana's query as direct evidence, since the words themselves do not show a discriminatory animus and thus the jury would have to draw an inference from the statement to find that the defendant violated sec. 1981. It also argues more generally that summary judgment was properly granted because no reasonable jury could return a verdict for Dr. Sanghvi.

Courts have noted the difficulty of defining direct evidence for discrimination claims. See, e.g., Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 581-84 (1st Cir. 1999); Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1183 (2d Cir. 1992). Our own statements on what constitutes direct evidence are not in complete harmony. One line of cases holds that "[d]irect evidence essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 616 (7th Cir. 2000); see also Hemisphere Bldg. Co., Inc. v. Village of Richton Park, 171 F.3d 437, 439 (7th Cir. 1999); Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 722 (7th Cir. 1998). Under this definition, Dr. Sanghvi has not produced

any direct evidence of discrimination since Triana's query clearly is not an admission. However, other cases hold that "[r]emarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality." Walker v. Glickman, 241 F.3d 884, 888 (7th Cir. 2001) (quoting Miller v. Borden, Inc., 168 F.3d 308, 312 (7th Cir. 1999)); see also Sheehan v. Donlen Corp., 173 F.3d 1039, 1044 (7th Cir. 1999); Venters v. City of Delphi, 123 F.3d 956, 973 (7th Cir. 1997). Triana's question might be direct evidence under this broader understanding, since the question can be read as indicating Triana's concern over whether Dr. Sanghvi, as a non-white physician, will be able to form doctor-patient relationships with white women. Cf. Sheehan, 173 F.3d at 1044-45 (holding that statement that woman was fired so she could "spend more time at home with her children" was direct evidence of discrimination on the basis of pregnancy).

While we acknowledge the tensions in our case law on this issue, we will assume without deciding that the broader definition of direct evidence applies and that Triana's question falls within this definition. Besides having a certain degree of content that reflects discriminatory animus, we have held that to qualify as direct evidence a statement must also be made by a decisionmaker, as well as relate to the action at issue. See Fyfe v. City of Fort Wayne, 241 F.3d 597, 602 (7th Cir. 2001); Hunt v. City of Markham, Ill., 219 F.3d 649, 652 (7th Cir. 2000). While the parties do not discuss the two conditions, these appear to be satisfied as well, since Dr. Sanghvi alleges that Triana as CEO of St. Mary controlled whom the practice would be sold to, and the query at issue was asked in the course of a discussion on the sale of the practice. Thus, for purposes of this case, we accept that Dr. Sanghvi has produced what may be labeled direct evidence.

However, the plaintiff is not out of the woods yet. Even in discrimination cases where the plaintiff has direct evidence, an adverse grant of summary judgment may

be proper. Davis v. Chevron U.S.A., Inc., 14 F.3d 1082, 1086-87 (5th Cir. 1994) (per curiam); FDIC v. Henderson, 940 F.2d 465, 473-74 (9th Cir. 1991)./3 This follows from Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986), which held that a grant of summary judgment against the non-moving party is appropriate, even where that party has produced some evidence, if no reasonable jury could return a verdict in his or her favor. See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp, 475 U.S. 574, 587 (1986)./4 While a grant of summary judgment against the plaintiff should be rare when he or she has evidence that could be characterized as direct, cf. Venters, 123 F.3d at 973 n.7, in a few select cases a review of the record as a whole may reveal that the evidence is "so one-sided that [the defendant] must prevail as a matter of law," Anderson, 477 U.S. at 252, at least where the purportedly direct evidence is not an actual admission. We conclude that this is such a case. Once the mass of uncontradicted evidence described below is taken into account, Triana's query is no more than a scintilla of evidence of racial discrimination and insufficient to permit a reasonable jury to return a verdict for Dr. Sanghvi./5

As briefly explained above, Triana's interrogatory is evidence of racial discrimination, since it suggests that Triana believed that Dr. Sanghvi could have difficulty forming patient relationships with white women because of his race. However, all of the other facts, which are basically undisputed, point to the conclusion that Dr. Sanghvi's ethnicity played no role in the defendant's decision to sell the practice assets to WWC. Triana made the initial offer to sell to Dr. Sanghvi in the days following June 11, prior to asking the potentially discriminatory query. After asking the question, Triana made a formal offer to Dr. Sanghvi on June 20. The terms of this initial offer were exactly the same as the defendant's opening position with WWC: $360,000, with no financing by the hospital. Triana then began negotiating in apparent good faith with the plaintiff. However, Dr. Sanghvi was unwilling or unable during June or early July to meet St. Catherine's requirement that the purchase price be paid in full. Even despite this fact, on

the evening of June 24, Triana seemed favorably inclined to accepting an offer by the plaintiff which called for financing. Furthermore, Dr. Sanghvi was informed on July 1 that if a deal with WWC could not be worked out, the defendant would sell the assets to him on the terms laid out in his June 25 letter. All of this evidence shows that the defendant was perfectly willing to sell Dr. Sanghvi Dr. Bonaventura's practice on the same terms as it would to any other buyer.

Indeed, given the July 1 conversation, the only reason that the sale was not made to Dr. Sanghvi was because of the appearance of a purchaser with a better offer, WWC. In July, WWC was willing to meet the no-financing condition of the hospital, unlike Dr. Sanghvi. The plaintiff complains that in the end WWC did not actually satisfy this condition, since it took over the practice on November 1, 1997 and did not pay in full until January 5, 1998. However, the record provides no indication that the defendant would have refused to let Dr. Sanghvi assume running the practice before his potential deal with the defendant was final, so long as the full payment price was tendered at the closing. Also, while both WWC and Dr. Sanghvi were offering the same price, $250,000, WWC's offer was clearly preferable from the defendant's perspective. Dr. Sanghvi's June 25, 1997 offer provided that all of the payments toward the $250,000 price would be refunded if he did not complete the twelve monthly installments. Thus, Dr. Sanghvi potentially could form valuable relationships with Dr. Bonaventura's former patients over an eleven month period, then claim he was unable to make the last payment, have all of his money returned, and be able to lure away a significant number of the patients to his own practice. This could have left the hospital with a greatly devalued asset, since other potential buyers would be unlikely to pay much for a practice with few regular patients, and no money to show for this depreciation. By contrast, WWC's offer did not impose this risk on the defendant since it would be paying all of the money at once and the payments could not be refunded. Finally, the defendant's June 20 letter demonstrated its concern about the limited resources

Dr. Sanghvi could provide as a sole practitioner. By contrast, WWC, as a group of obstetrician/gynecologists, could provide much broader coverage and thus increase the revenues of the hospital through referrals.

In short, even if Triana's question might possibly be understood as suggesting some concern over the plaintiff's race, the surrounding facts demonstrate that St. Catherine's refusal to sell to Dr. Sanghvi was not motivated by racial or ethnic considerations, and no reasonable jury could find otherwise. We note that our decision is consistent with Davis, which affirmed a grant of summary judgment where an interviewer asked a female job applicant a "question concerning [her] ability to supervise and handle disputes with and among men," 14 F.3d at 1086, an interrogatory obviously quite similar to Triana's.

Dr. Sanghvi also contends that the rejection of his November 6 offer, which he claims was more favorable than WWC's because he was willing to pay a higher price, sufficiently supports his claim of discrimination to send the case to a jury. However, we have determined that Triana's negotiations with Dr. Sanghvi in June allay any supposition that Triana's actions were motivated by an impermissible animus, and that conclusion carries over to the rejection of the November 6 offer. Furthermore, by November the defendant had additional reasons not related to race or ethnicity for rejecting Dr. Sanghvi's offer. First, the defendant feared litigation with WWC for breach of contract if it suddenly ejected WWC from Dr. Bonaventura's practice after agreeing to an outline of the terms on which the practice would be sold in July. Second, Dr. Sanghvi's August 2 letter showed antagonism toward the defendant, creating questions as to whether he would be as willing to refer patients to the defendant as WWC. Third, Dr. Sanghvi's allegedly impermissible direct billing when he filled in for Dr. Bonaventura had been discovered. Since St. Catherine's was later to file a counterclaim against Dr. Sanghvi for the amount of this direct billing, the defendant understandably did not want to depend for referrals on a doctor with whom it would soon be in litigation. Given all of these additional reasons for rejecting the November offer, we conclude

that no reasonable jury could find that the defendant acted with discriminatory intent at that time.

B.   Burden-Shifting Method

Under the frequently applied burden-shifting method established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the plaintiff must establish his or her prima facie case, then the defendant must articulate one or more legitimate, nondiscriminatory reasons for its action, and finally the plaintiff has an opportunity to show that the defendant's reasons are pretextual. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). While we do not underestimate the importance of requiring a plaintiff to satisfy the first step, see Coco v. Elmwood Care, Inc., 128 F.3d 1177, 1178 (7th Cir. 1997) ("emphasiz[ing] that the prima facie case under McDonnell Douglas must be established and not merely incanted"), we will skip to the question of pretext, in part because of the lack of a well-developed list of elements for a prima facie sec. 1981 case outside of the employment context.

The defendant argues that it did not sell to Dr. Sanghvi because a better deal was presented by WWC. This is a legitimate reason for refusing to sell the practice assets to the plaintiff and Dr. Sanghvi cannot show that this reason is pretextual. The explanation for this conclusion tracks part of our discussion of why Dr. Sanghvi's direct evidence does not present a genuine issue of material fact, and so we will only briefly list the reasons supporting the defendant's sale to WWC rather than the plaintiff. In July, WWC offered to pay the defendant in a lump sum, something that the hospital had insisted upon and that Dr. Sanghvi could not do. Selling to WWC also increased the number of referrals that the hospital was likely to receive, since WWC was a group of physicians rather than a sole practitioner like Dr. Sanghvi. WWC's deal also did not have the refund provision contained in the plaintiff's June 25 offer.

Nor can Dr. Sanghvi show that the defendant's reasons for refusing to accept his offer on November 6 are pretextual. The defendant legitimately

was concerned about being sued for breach of contract if it reclaimed the assets from WWC. The hospital could have still preferred WWC, even though it was offering less money, because its greater number of doctors would lead to more referrals and thus greater revenue for the hospital in the long run. Also, the discovery of Dr. Sanghvi's billing practices when he was filling in for Dr. Bonaventura and his August 2 letter, which was hostile to the defendant and seemingly an attempt to lure away Dr. Bonaventura's former patients to his practice, indicated that the defendant was unlikely to receive many referrals from the plaintiff if it sold him the practice.

III.  Conclusion

We assume for purposes of this case that Triana's question falls within the outer ambit of direct evidence of racial discrimination. However, the other undisputed evidence prevents any reasonable jury from concluding that the defendant's decision to sell Dr. Bonaventura's practice to WWC rather than Dr. Sanghvi was motivated by racial or ethnic discrimination. Likewise, under the burden-shifting method Dr. Sanghvi cannot cast sufficient doubt on the reasons for the defendant's refusal to sell the practice to him to raise a triable issue as to pretext. Therefore, the district court's decision is Affirmed.

FOOTNOTES

/1 St. Mary Medical Center, though named as a defendant in the original suit and included in the notice of appeal, was dismissed from this action by order of the district court on June 10, 1999 as per the parties' stipulations.

/2 Triana denies asking this question, but since the district court granted summary judgment to the defendant, we resolve all factual disputes in favor of Dr. Sanghvi. Ghosh v. Indiana Dep't of Envtl. Management, 192 F.3d 1087, 1094 n.2 (7th Cir. 1999).

/3 Contrary statements appear in some cases. For example, Cardona Jimenez v. Bancomerico de P.R., 174 F.3d 36, 40 (1st Cir. 1999) and Alvarez-Fonseca v. Pepsi Cola of P.R. Bottling Co., 152 F.3d 17, 24 (1st Cir. 1998), both Age Discrimination in Employment Act cases, opine that where a discrimination plaintiff has direct evidence, the

case may be put to the fact finder "without further ado." However, these single, isolated statements are both clearly dicta, since direct evidence was not present in either case. Eisenberg v. Insurance Co. of N. Am., 815 F.2d 1285, 1289 (9th Cir. 1987), a diversity contract case, states that "if the non-moving party adduces direct evidence of a genuine issue of fact . . . [the case] is to be submitted to the trier of fact for resolution." However, this statement conflicts with the Ninth Circuit's later decision in Henderson, which provides the most thorough discussion of the issue which we have found. To the extent that other decisions conflict with our holding, we decline to follow them, largely for the reasons explained in Henderson, 940 F.2d at 474.

/4 Of course, if the non-moving party has presented sufficient evidence to permit a reasonable jury to find for him or her, then a court cannot weigh the evidence on summary judgment and the motion must be denied. See Anderson, 477 U.S. at 255.

/5 We hold that no reasonable jury could find that racial animus was a motivating factor of the defendant's decision. However, even if this were not so, another barrier possibly exists to Dr. Sanghvi's recovery. Before the Civil Rights Act of 1991 ("CRA") was passed, an employer could escape all liability under Title VII or other federal anti-discrimination laws where the plaintiff presented sufficient evidence for a jury to conclude that impermissible animus was a motivating factor in the decision if the employer could demonstrate that it would have taken the same action for legitimate reasons alone. Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). The CRA amended Title VII so that in such cases a plaintiff need only show that an illegal criterion was a "motivating factor" of the defendant's decision in order to obtain relief, 42 U.S.C. sec. 2000e-2(m), though his or her recovery will be limited if the defendant can show that legitimate reasons alone would have led to the same action, 42 U.S.C. sec. 2000e-5(g)(2)(B). However, Dr. Sanghvi's claim is under sec. 1981 rather than Title VII. At least one circuit court has held that the framework of Price Waterhouse, rather than 42 U.S.C. sec. 2000e-2(m), continues to apply to sec. 1981 claims. Mabra v. United Food & Commercial Workers Local Union No. 1996, 176 F.3d 1357 (11th Cir. 1999). If this is correct, then even if Dr. Sanghvi could raise a genuine issue of fact as to whether the refusal to sell the practice to him was racially motivated, St. Catherine's would be relieved of all liability if it could show that it would have taken the same action because of WWC's offer even in the absence of any discriminatory animus. However, since we

conclude that Dr. Sanghvi does not raise a genuine issue as to whether the defendant's refusal to sell the practice to him was motivated in part by racial bias, we need not reach this issue.