Christopher Lee PETERSON, Plaintiff,

v.

WILMUR COMMUNICATIONS,
INC., Defendant.

No. 01–C–0162.

United States District Court,
E.D. Wisconsin.

June 3, 2002.

Janet L. Heins, Milwaukee, WI, for Plaintiff.

Robert N. Meyeroff, Milwaukee, Wi, for Defendant.

### DECISION AND ORDER

ADELMAN, District Judge.

## I. FACTS AND BACKGROUND

Plaintiff, Christopher Lee Peterson, is a follower of the World Church of the Creator, an organization that preaches a system of beliefs called Creativity, the central tenet of which is white supremacy. Creativity teaches that all people of color are "savage" and intent on "mongreliz[ing] the White Race," that African–Americans are subhuman and should be "ship[ped] back to Africa"; that Jews control the nation and have instigated all wars in this century and should be driven from power, and that the Holocaust never occurred, but if it had occurred, Nazi Germany "would have done the world a tremendous favor." (R. 26 ¶ 2.) An introductory pamphlet about Creativity states:

> After six thousand years of recorded history, our people finally have a religion of, for, and by them. CREATIVITY is that religion. It is established for the Survival, Expansion, and Advancement of [the] White Race exclusively. Indeed, we believe that what is good for the White Race is the highest virtue, and what is bad for the White Race is the ultimate sin.
>
> We have come to hold these views by observing the Eternal Laws of Nature, by studying History, and by using the Logic and Common Sense everyone is born with: the highest Law of Nature is the survival of one's own kind; history has shown the United States that the White Race is responsible for all that which we call progress on this earth; and that it is therefore logical and sensible to place supreme importance upon Race and to reject all ideas which fail to do so.

(R. 20 Ex. 3.)

Creativity considers itself to be a religion, but it does not espouse a belief in a

God, afterlife or any sort of supreme being. "Frequently Asked Questions about CREATIVITY," a publication available on the World Church of the Creator's website, characterizes such beliefs as unsubstantiated "nonsense about angels and devils and gods and . . . silly spook craft" and rejects them in favor of "the Eternal Laws of Nature, about which [Creators say] the White Man does have an impressive fund of knowledge." (R. 25 Ex. C at 8.) *The White Man's Bible*, one of Creativity's two central texts, offers a vision of a white supremacist utopian world of "[b]eautiful, [h]ealthy [white] people," free of disease, pollution, fear and hunger. (R. 29 Ex. 1 at 5–7.) This world can only be established through the degradation of all non-whites. *Id.* Thus, Creativity teaches that Creators should live their lives according to the principle that what is good for white people is the ultimate good and what is bad for white people is the ultimate sin. *Id.* at 3. According to *The White Man's Bible*, the "survival" of white people must be ensured "at all costs." (R. 26 ¶ 2.) Plaintiff holds these beliefs and, in June 1998, became a "reverend" in the World Church of the Creator.

In 2000, plaintiff was employed by defendant Wilmur Communications, Inc. as a Day Room Manager, a position which entailed supervising eight other employees, three of whom were not white. On Sunday, March 19, 2000, an article appeared in the *Milwaukee Journal Sentinel* discussing the World Church of the Creator, interviewing plaintiff, and describing his involvement in the church and beliefs. The article included a photograph of plaintiff holding a tee-shirt bearing a picture of Benjamin Smith, who, carrying a copy of *The White Man's Bible*, had targeted African–American, Jewish and Asian people in a two-day shooting spree in Indiana and Illinois before shooting himself in the summer of 1999. The caption under the photograph read "Rev. C. Lee Peterson of Mil-

waukee holds a T-shirt commemorating Benjamin Smith, who killed two people and wounded nine others before shooting himself in a two-day spree last summer." (R. 25 Ex. D at 3.)

When plaintiff arrived at work the next day, his supervisor and the president of the company, Dan Murphy, suspended him without pay. Two days later, plaintiff received a letter from Murphy demoting him to the position of "telephone solicitor," a position with lower pay and no supervisory duties. I restate the text of the letter in full:

On Sunday, March 19, 2000, an article appeared in the *Milwaukee Journal/Sentinel* stating that you were a member of the World Church of the Creator, a White supremacist political organization. On Monday, March 20, 2000, the information in the newspaper article was known by everyone in our office.

Our office has three out of eight employees who are not White. As of March 20, 2000, you were their supervisor. As a supervisor, it is your responsibility to train, evaluate, and supervise telephone solicitors. Our employees cannot have confidence in the objectivity of your training, evaluation, or supervision when you must compare Whites to non-Whites.

Because the company, present employees, or future job applicants cannot be sure of your objectivity, you can no longer be a supervisor and you are hereby notified of your demotion to a telephone solicitor effective March 22, 2000.

(R. 20 Ex. C.) During his six years of employment at Wilmur Communications, plaintiff had been disciplined once for a data entry error but had never been disciplined for anything else.

Plaintiff has moved for summary judgment arguing that defendant demoted him

because of his religion in violation of Title VII of the Civil Rights Act of 1964. Defendant has filed a cross motion for summary judgment. These motions are before me now.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis deleted). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

The moving party bears the initial burden of demonstrating that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the non-moving party's case, the moving party may satisfy its initial burden simply by pointing out the absence of evidence. *Id.* at 325, 106 S.Ct. 2548. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id.* at 322–23, 106 S.Ct. 2548. Neither party may rest on mere allegations or denials in the pleadings, *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505,

or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir.1989).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

When reviewing cross motions for summary judgment, I assess the merits of each summary judgment motion independently. *See* 10A Charles Alan Wright, et al., *Federal Practice and Procedure* § 2720 at 335 (3d ed.1998). Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. *Id.* The fact that one party fails to satisfy that burden on its own motion does not automatically indicate that the opposing party has satisfied its burden and must be granted summary judgment on its motion. *Id.* I may grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law on the basis of the material facts not in dispute. *See Mitchell v. McCarty,* 239 F.2d 721, 723 (7th Cir.1957).

## III. DISCUSSION

### A. Applicable Law

■ Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e–2(a). The statute defines "religion" to include "all

aspects of religious observance and practice, as well as belief." *Id.* § 2000e(j). The definition imposes on an employer an "affirmative duty" to reasonably accommodate the "religious observance and practices of its employees, unless the employer can demonstrate that such an accommodation would cause undue hardship to the conduct of its business." *EEOC v. Ilona of Hungary, Inc.,* 108 F.3d 1569, 1574 (7th Cir.1997) (citing 42 U.S.C. § 2000e(j)).

▪ As a threshold matter, the plaintiff must show that his or her beliefs constitute a "religion" under the meaning of Title VII. *See id.* The determination of what is a religion or religious belief "is more often than not a difficult and delicate task." *Thomas v. Review Bd. of the Ind. Employment Sec. Div.,* 450 U.S. 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *see also Africa v. Pa.,* 662 F.2d 1025, 1031 (3d Cir.1981) ("Few tasks that confront a court require more circumspection than that of determining whether a particular set of ideas constitutes a religion."). Deciding how to distinguish a religion from other types of beliefs or belief systems has been a source of great controversy for courts and commentators. *See generally* Rebecca Redwood French, *From Yoder to Yoda: Models of Traditional Modern, and Postmodern Religion in the United States,* 4 Ariz.L.Rev. 49 (1999); James M. Donovan, *God Is as God Does: Law, Anthropology, and the Definition of "Religion,"* 6 Seton Hall Const.L.J. 23 (1995). In addition, the Supreme Court has noted the care that courts must exercise in this area to avoid making theological pronouncements that exceed the judicial ken. *See, e.g., Employment Div., Dep't of Human Res. of Or. v. Smith,* 494 U.S. 872, 887, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (collecting cases).

▪ Nonetheless, a test has emerged to determine whether beliefs are a religion for purposes of Title VII. Rather than define religion according to its content, the test requires courts take a functional approach and ask whether a belief "functions as" religion in the life of the individual before the court. *See Redmond v. GAF Corp.,* 574 F.2d 897, 901 n. 12 (7th Cir. 1978) (citing *United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) and *Welsh v. United States,* 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970) and stating that they supply the test for determining what is a "religion" under Title VII); 29 C.F.R. § 1605.1 (same). Stated another way, the court should find beliefs to be a religion if they "occupy the same place in the life of the [individual] as an orthodox belief in God holds in the life of one clearly qualified." *Seeger,* 380 U.S. at 184, 85 S.Ct. 850. To satisfy this test, the plaintiff must show that the belief at issue is " 'sincerely held' " and " 'religious' in [his or her] own scheme of things." *Redmond,* 574 F.2d at 901 n. 12 (quoting *Seeger,* 380 U.S. at 185, 85 S.Ct. 850). In evaluating whether a belief meets this test, courts must give " 'great weight' " to the plaintiff's own characterization of his or her beliefs as religious. *Seeger,* 380 U.S. at 184, 85 S.Ct. 850.

▪ To be a religion under this test, a belief system need not have a concept of a God, supreme being, or afterlife, *Welsh,* 398 U.S. at 339–40, 90 S.Ct. 1792; *United States v. Bush,* 509 F.2d 776, 780–84 (7th Cir.1975) (en banc) (finding religious the ethical beliefs of an atheist who did not believe in an afterlife), or derive from any outside source. Purely "moral and ethical beliefs" can be religious "so long as they are held with the strength of religious convictions." *Welsh,* 398 U.S. at 339–40, 90 S.Ct. 1792.

▪ Courts also should not attempt to assess a belief's "truth" or "validity." *Seeger,* 380 U.S. at 184–85, 85 S.Ct. 850; *see Thomas,* 450 U.S. at 714, 101 S.Ct.

1425 (Resolution of whether a belief is religious does "not turn upon a judicial perception of the particular belief or practice in question."); *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144 n. 9, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987) (stating that truth of plaintiff's beliefs is irrelevant); *Seeger*, 380 U.S. at 185, 85 S.Ct. 850 ("[C]ourts ... are not free to reject beliefs because they consider them incomprehensible."). So long as the belief is sincerely held and is religious in the plaintiff's scheme of things, the belief is religious regardless of whether it is "acceptable, logical, consistent, or comprehensible to others." *Thomas*, 450 U.S. at 714, 101 S.Ct. 1425.

Once a plaintiff establishes that his or her beliefs are a religion, the plaintiff must offer evidence that his or her religion "played a motivating role" in the adverse employment action at issue. *Venters v. City of Delphi*, 123 F.3d 956, 973 n. 7 (7th Cir.1997) (citing 42 U.S.C. § 2000e–2(m)). A plaintiff can meet this burden by presenting direct evidence of the defendant's discriminatory intent, the method that plaintiff has chosen here, or by the indirect method articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Id.* Direct evidence is evidence which, " 'if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption.' " *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 910 (7th Cir.2002) (quoting *Randle v. La Salle Telecom. Inc.*, 876 F.2d 563, 565–69 (7th Cir.1989)). It includes "acknowledgment of discriminatory intent by the defendant," *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994), and "[r]emarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria," *Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir.2001) (quoting *Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir.1999)).

The statements must also be "made by a decisionmaker ... [and] relate to the [employment] action at issue." *Sanghvi v. St. Catherine's Hosp., Inc.*, 258 F.3d 570, 574 (7th Cir.2001).

However, Title VII proscribes two different types of religious discrimination—discrimination on the basis of a religious observance or practice and discrimination on the basis of pure belief. *See* 42 U.S.C. § 2000e(j). These two types of discrimination are analyzed differently. *See id.* When an employee shows that her employer took an adverse employment action against her on the basis of a religious observance or practice, the employer can avoid liability by showing either that it reasonably accommodated the employee's observance or practice, or that accommodation of the observance or practice would result in an undue hardship for the employer. *Ilona of Hungary*, 108 F.3d at 1576. However, when an employee shows that her employer took an adverse action against her on the basis of her religious beliefs, and not because of an observance or practice, the employer is liable. *See* 42 U.S.C. § 2000e(j); *Venters*, 123 F.3d at 972–73. Explanation of the distinction between and origin of these two different types of cases requires some discussion of the structure of Title VII and the history of the provision barring religious discrimination.

In Title VII discrimination actions based on other protected criteria, such as race, sex or national origin, once the plaintiff proves that the proscribed criterion played a motivating role in the adverse employment action, the plaintiff has prevailed on the issue of liability. *See* 42 U.S.C. § 2000e–2(m). However, the provision relating to religion differs in some respects because of the manner in which the statute defines religion. Under Title VII, " 'religion' includes all aspects of religious ob-

servance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's ... religious observance or practice without undue hardship on the employer's business." *Id.* § 2000e(j). In other words, if accommodating an employee's religious observances or practices would cause the employer undue hardship, those observances or practices are exempted from the definition of religion and can, therefore, lawfully motivate an adverse employment action. *See id.* Thus, where a plaintiff seeks accommodation of a "religious observance or practice," the defendant can avoid liability entirely by demonstrating either reasonable accommodation of the observance or practice, or that accommodation would result in an undue hardship. *Ilona of Hungary,* 97 F.3d at 211.

However, the accommodation clause of the definition applies only to "religious observance[s] or practice[s]," not religious belief. *See* 42 U.S.C. § 2000e(j). The language of the definition makes clear that the omission of "belief" from the accommodation clause was intentional. The first clause of the definition states that "religion" means "observance and practice, as well as belief." However, the second clause exempts from the definition "observance[s] or practice[s]" which would result in an undue hardship on the employer, but not beliefs. *Id.* Thus, under the canon of statutory interpretation *expressio unis,* I must conclude that a religious belief is never exempted from the definition of "religion" under Title VII and, therefore, cannot lawfully form the basis for an adverse employment action.

The precise meanings of "observance or practice" and "belief" require further explication. "Observance" means "something (as an act of religious or ceremonial nature) that is carried out in accord with prescribed forms; a customary practice,

rite, or ceremony; ... an act or the practice of paying due heed to something established; ... an act or instance of observing." *Webster's Third New International Dictionary of the English Language Unabridged* 1558 (3d ed.1986). "Practice" means a "performance or operation of something; ... a mode of acting or proceeding; actual performance or application of knowledge as distinguished from mere possession of knowledge." *Id.* at 1780. Thus, a "religious observance or practice" requires at a minimum an act. "Belief," on the other hand, means "a state or habit of mind; ... a conviction of the truth of some statement [or] ... immediate assurance or feeling of the reality of something." *Id.* at 200. A "religious belief" does not require an act. Therefore, under Title VII, an employer can avoid liability for failing to reasonably accommodate religiously-motivated acts, but cannot avoid liability for taking an adverse employment action based on the employee's pure beliefs, unaccompanied by acts.

This reading of the statute is consistent with its legislative history. Prior to the amendment defining religion, which was added in 1972, many courts considered religion under the statute to mean only pure belief and not acts. *See* Karen Engle, *The Persistence of Neutrality: The Failure of the Religious Accommodation Provision to Redeem Title VII,* 317 Tex.L.Rev. 317, 362–69 (1997). Thus, an employer was liable if it discharged an employee for his or her beliefs, but not liable if it discharged the employee for engaging in conduct pursuant to those beliefs, such as refusing to work on the Sabbath. *See, e.g., Dewey v. Reynolds Metals Co.,* 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971) (per curiam), *aff'g by an equally divided court* 429 F.2d 324 (6th Cir.1970); *Riley v. Bendix Corp.,* 330 F.Supp. 583 (M.D.Fla. 1971). By adding a definition of religion,

Congress intended to reverse these cases and expand the coverage of the act to require employers to accommodate certain religiously-motivated acts. *See* 118 Cong. Rec. 705–06 (1972) (statement of Sen. Randolph) (stating that purpose of amendment is to expand religious non-discrimination right to encompass religious observances); *id.* at 706–13 (reprinting *Dewey,* 429 F.2d 324 and *Riley,* 330 F.Supp. 583 to demonstrate courts' prior interpretations of "religion" based on belief-act distinction); *id.* at 7,167 (stating that purpose of the amendment is to reverse decisions in cases such as *Dewey,* 429 F.2d 324). Thus, the amendment was intended to leave the prohibition of religious discrimination on the basis of pure belief unchanged.

In addition, the amendment was intended to make the Title VII religious discrimination analysis the same as the analysis of claims under the Free Exercise Clause, thereby providing private and public employees with the same rights to be free from religious discrimination. 118 Cong. Rec. 705 (1972) (statement of Sen. Randolph). Under the Free Exercise Clause, it is well-established that pure belief is absolutely protected. *Employment Div.,* 494 U.S. at 877, 110 S.Ct. 1595 (quoting *Sherbert v. Verner,* 374 U.S. 398, 402, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)) ("The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires. Thus, the First Amendment obviously excludes all 'governmental regulation of religious *beliefs* as such.' "); *Torcaso v. Watkins,* 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); *United States v. Ballard,* 322 U.S. 78, 86–88, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). Thus, legislative history reinforces the principle that under Title VII, an employer cannot lawfully take an adverse employment action against an employee based on pure belief.

Seventh Circuit precedent is to the same effect. The court has held that the accommodation analysis does not apply when an employee is discharged because she does not share her supervisor's religious beliefs. *See Venters,* 123 F.3d at 972; *see also Shapolia v. Los Alamos Nat'l Lab.,* 992 F.2d 1033, 1037 (10th Cir.1993). Because there was no evidence that the plaintiff employee in *Venters* sought to engage in any religiously-motivated act, the accommodations analysis did not apply. *Venters,* 123 F.3d at 972. Rather, the court held that proof of discrimination on the basis of pure belief compels a finding of liability, as proof of discrimination on the basis of race or sex would. *Id.* With these principles in mind I turn to the case before me.

**B. Application of Law to Facts**

I address plaintiff's motion for summary judgment first and take all the facts in the light most favorable to the defendant, *see Matsushita Elec. Indus.,* 475 U.S. at 587, 106 S.Ct. 1348. Further, because plaintiff does not discuss or present evidence concerning damages, I will treat his motion as one for summary judgment only on liability.

**1. Creativity is a "Religion" under Title VII**

The parties hotly dispute whether Creativity is a religion under Title VII. Thus, as an initial matter, I must determine whether plaintiff's beliefs are "sincerely held" and "religious in his own scheme of things." *See Redmond,* 574 F.2d at 901 n. 12 (internal citations and quotation marks omitted).

Here, the first prong is undisputed. Plaintiff states that he has "a sincere belief" in the teachings of Creativity (R. 20 ¶ 4); and defendant offers no contrary evidence. Thus, plaintiff meets the first prong of the test.

The second prong is also undisputed. Plaintiff considers his beliefs religious and considers Creativity to be his religion. I must give "great weight" to that belief. *See Seeger,* 380 U.S. at 184, 85 S.Ct. 850. In addition, Creativity plays a central role in plaintiff's life. Plaintiff has been a minister in the World Church of the Creator for more than three years. Upon becoming a minister, he took the following oath:

Having been duly accepted for the Ministry in The World Church of the Creator, I hereby reaffirm my undying loyalty to the White Race and The World Church of the Creator and furthermore swear allegiance unto Pontifex Maximus Matt Hale, and his duly appointed successors; that I will carry out all instructions assigned to me; that I will fervently promote the Creed and Program of Creativity as long as I live; that I will follow the Sixteen Commandments and encourage others to do the same; that the World Church of the Creator is the only pro-White organization of which I am a member so that my energies may not be divided; that I will remain knowledgeable of our sacred Creed, particularly of the books, Nature's Eternal Religion and The White Man's Bible; that I will always exhibit high character and respect; and lastly, that I will aggressively convert others to our Faith and build my own ministry.

(R. 20 Ex. 2.) Plaintiff states that he "work[s] at putting [the teachings of Creativity] into practice every day." (R. 20 ¶ 4.) Thus, all the evidence conclusively reveals that the teachings of Creativity are "religious" in plaintiff's "own scheme of things." These beliefs occupy for plaintiff a place in his life parallel to that held by a belief in God for believers in more mainstream theistic religions. Thus, Creativity "functions as" religion for plaintiff. Plaintiff has met his initial burden of showing that his beliefs constitute a "religion" for purposes of Title VII.

Rather than argue that plaintiff cannot meet the test for establishing that his beliefs are a religion, defendant argues that the World Church of the Creator cannot be a religion under Title VII because it is similar to other white supremacist organizations that have been found to be political organizations and not religions. *See Slater v. King Soopers, Inc.,* 809 F.Supp. 809 (D.Colo.1992) (finding that Klu Klux Klan is not a religion under Title VII); *Bellamy v. Mason's Stores, Inc.,* 368 F.Supp. 1025 (E.D.Va.1973) (same); *Augustine v. Anti-Defamation League of B'nai-B'rith,* 75 Wis.2d 207, 249 N.W.2d 547 (1977) (finding that National Socialist White People's Party does not fall within definition of "creed" under state anti-discrimination statute because it is not a religion). However, the cases defendant cites are of no assistance.

First, the fact that certain white supremacist organizations have been found not to be religions does not logically mean that Creativity also is not a religion for plaintiff, given that the test for what is a religion turns in part on subjective factors. Second, the courts in *Bellamy* and *Slater* provide little discussion as to how they reach their conclusions. The court in *Bellamy* simply stated that the KKK's "proclaimed racist and anti-semitic ideology ... takes on ... a narrow, temporal and political character inconsistent with the meaning of 'religion.'" *Bellamy,* 368 F.Supp. at 1026. The court in *Slater* quoted this passage in *Bellamy* and reached the same result without further discussion. *Slater,* 809 F.Supp. at 810. Thus, these cases do not assist me in determining how the World Church of the Creator might be similar to or different from the KKK.

The only case to discuss the KKK in any detail is a decision by the EEOC. *See* EEOC Dec. No. 79-06 (Oct. 6, 1978). The EEOC recounted the KKK's history and stated purposes and concluded that it con-

sidered itself to be a political and fraternal organization, and not a religion. *Id.* at 2–7. Given that evidence, the EEOC unsurprisingly concluded that the KKK was not a religion. *Id.* at 6–7. However, in the case before me, the World Church of the Creator plainly considers Creativity to be a religion. This assertion weighs heavily in favor of finding that the belief system is a religion. *Seeger,* 380 U.S. at 184, 85 S.Ct. 850. Thus, the EEOC decision does not support defendant's position either.

*Augustine,* also cited by the defendant, is of no assistance for the same reason. In *Augustine,* the Supreme Court of Wisconsin concluded that the National Socialist White People's Party is a political organization and not a religion because the party did not believe itself to be a religion. *Augustine,* 75 Wis.2d at 213, 249 N.W.2d 547 ("There is no contention that the philosophy of [the National Socialist White People's Party is] of a religious nature."). As stated previously, the World Church of the Creator plainly believes Creativity to be a religion.

To be sure, Creativity shares some of the white supremacist beliefs of the KKK and the National Socialist White People's Party. However, the fact that plaintiff's beliefs can be characterized as political does not mean they are not also religious. *See Welsh,* 398 U.S. at 342, 90 S.Ct. 1792 (finding conscientious objector's opposition to war religious even though it was also based in part on his views of world politics); *Rodriguez v. City of Chi.,* 156 F.3d 771, 775 (7th Cir.1998) (assuming without discussion that plaintiff's opposition to abortion was religiously-motivated even though it could also be characterized as political). Thus, plaintiff could share the beliefs of political organizations yet still establish that his beliefs function as religion for him. I have already determined that plaintiff has made that showing.

Defendant also argues that Creativity's beliefs cannot be religious because they are immoral and unethical, and EEOC regulations define religious beliefs as "moral or ethical beliefs as to what is right and wrong," 29 C.F.R. § 1605.1. However, defendant misinterprets the regulation. The regulation does *not* indicate that Title VII only protects beliefs which defendant, society, the court or some other entity considers moral or ethical in the subjective sense. Indeed, the question of whether I find a belief moral, ethical or otherwise valid in this subjective sense is decidedly not at issue when I am determining whether a belief is "religious." *See Thomas,* 450 U.S. at 714, 101 S.Ct. 1425 (Resolution of whether a belief is religious does "not turn upon a judicial perception of the particular belief or practice in question."); *Hobbie,* 480 U.S. at 144 n. 9, 107 S.Ct. 1046 (stating that truth of plaintiff's beliefs is irrelevant); *Seeger,* 380 U.S. at 185, 85 S.Ct. 850 ("[C]ourts ... are not free to reject beliefs because they consider them incomprehensible."). Rather, the EEOC regulation means that "religion" under Title VII includes belief systems which espouse notions of morality and ethics and supply a means from distinguishing right from wrong. Creativity has these characteristics. Creativity teaches that followers should live their lives according to what will best foster the advancement of white people and the denigration of all others. This precept, although simplistic and repugnant to the notions of equality that undergird the very non-discrimination statute at issue, is a means for determining right from wrong. Thus, defendant's argument must be rejected.

Similarly, defendant argues that the Court in *Seeger* and *Welsh* found the individuals' beliefs "religious" because they rested on notions of "goodness, morality, and living up to the highest ideals of society," not "separation, exclusion, repatria-

tion, hatred, or killing," like plaintiff in this case. (R. 23 at 4–5.) The court has no quarrel with defendant's subjective characterization of the plaintiff's belief system. However, as discussed previously, Title VII protects against discrimination on the basis of religion, regardless of the court's or any one else's opinion of the religion at issue. Plaintiff has shown that Creativity functions as religion in his life; thus, Creativity is for him a religion regardless of whether it espouses goodness or ill. Defendant's argument is again rejected.

### 2. Religion Played a Motivating Role in the Demotion

■ Having established that Creativity is for plaintiff a religion, the plaintiff must offer evidence that his religion played a motivating role in the adverse employment action, in this case his demotion. *See Venters*, 123 F.3d at 973 n. 7. As discussed above, plaintiff can meet this burden by offering direct evidence or indirect evidence. *Id.* Plaintiff here has chosen the direct evidence method.

Plaintiff argues that Murphy's letter of demotion provides direct evidence that he was demoted because of his religion. The letter meets two requirements for direct evidence because it is from the decision-maker and relates directly to the adverse action at issue, the demotion. *See Sanghvi*, 258 F.3d at 574. Thus, to constitute direct evidence, it must also contain an "acknowledgment of discriminatory intent," *see Troupe*, 20 F.3d at 736, or reveal a propensity to make decisions based on unlawful criteria, *see Walker*, 241 F.3d at 888 (internal citations omitted). Here, the letter, which followed directly on the heels of the newspaper article discussing plain-

tiff's beliefs, contains an acknowledgment of discriminatory intent. Murphy states that because plaintiff is "a member of the World Church of the Creator, a White supremacist political organization ... employees cannot have confidence in the objectivity of [his] training, evaluation, or supervision when [he] must compare Whites to non-Whites." (R. 20 Ex. C.) This statement is an admission that Murphy demoted plaintiff because of his religion. Thus, plaintiff has met his burden.

However, to determine whether the defendant can avoid liability through an accommodation analysis, I must also determine whether plaintiff has shown that he was demoted because of a religious observance or practice, or because of his religious beliefs alone. *See* 42 U.S.C. § 2000e(j). Here, the evidence conclusively reveals that he was demoted because of his beliefs, not because of any act. The letter of demotion from Murphy plainly states that plaintiff was being demoted because of his membership in the World Church of the Creator and his white supremacist beliefs. The letter does not say that defendant could not accommodate any religious observance or practice. Indeed, plaintiff did not seek accommodation of any observance or practice. Thus, plaintiff's beliefs caused defendant to demote him and defendant is, therefore, liable. The accommodation analysis does not apply.

Nevertheless, defendant argues that plaintiff was not demoted only because of his beliefs, but also because of his religious practices.[1] Thus, according to defendant, the accommodation analysis does apply. However, for the analysis to apply, the record must contain evidence from which a

---

1. I assume for purposes of addressing defendant's argument that for plaintiff, treating employees differently because of their races could be a religious "observance or practice" under Title VII. However, because the record does not contain sufficient evidence from which a jury could conclude that plaintiff engaged in such conduct, I need not decide whether this assumption is appropriate.

reasonable jury could find that plaintiff engaged or sought to engage in a religiously-motivated act and was demoted because of it. To show that plaintiff engaged in an act, defendant points to two pieces of evidence in the record. The first is a statement in an affidavit from Murphy in which he asserts, "[d]uring the time the plaintiff was a supervisor, Black employees complained ... that they were being disciplined for being late while White employees were not being disciplined for being late." (R. 24 ¶ 3.) The second is a letter from defendant's attorney submitted to the Wisconsin Equal Rights Division stating that Murphy told him that African–American employees had complained that plaintiff disciplined them unfairly, and that plaintiff's views "became a large problem when employees, especially the Black employees learned" of them. (R. 19 Ex. E.)

■■■ However, these statements suffer from several evidentiary maladies. First, if offered to show that plaintiff actually engaged in some act pursuant to his beliefs, i.e. treating African–American and white employees unequally, the first statement is hearsay and the second statement is double hearsay. *See* Fed.R.Evid. 801(c). Hearsay statements cannot be considered on motions for summary judgment. *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir.2001); *Minor v. Ivy Tech State Coll.*, 174 F.3d 855, 856 (7th Cir.1999). In addition, under Fed.R.Civ.P. 56(e), affidavits supporting or opposing summary judgment must be made on personal knowledge and "show affirmatively that the affiant is competent to testify to the matters stated therein." Murphy's statements do not meet this standard. Thus, they are inadmissible.

Further, even if I considered the statements, they are so lacking in specificity that they fail to raise a genuine issue of material fact either as to whether plaintiff committed any acts or whether such acts

caused his demotion. Rule 56(e) requires a party opposing a summary judgment motion to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Affidavits must set forth " 'specific concrete facts in support of the matter asserted' " or they should be disregarded. *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir.1998) (quoting *Hadley v. County of DuPage*, 715 F.2d 1238, 1243 (7th Cir.1983)) (upholding district court's decision to disregard statement by affiant that " '[e]very time' " African–American employees complained, defendant " 'would never conduct an investigation or take any action' " because affiant did not recount examples of this conduct).

Neither Murphy's nor the attorney's statement satisfies the specificity requirement. Murphy's statement is phrased in the passive voice and does not actually say that any employee complained about plaintiff. Moreover, his statement is utterly devoid of facts such as who complained, when they complained, whether plaintiff was informed of the complaints and what the result was. The lawyer's statement is equally lacking in specificity. Additionally, the assertion that defendant demoted plaintiff based on acts as opposed to beliefs is contradicted by the demotion letter, which mentions neither acts nor complaints. Thus, the statements fail to satisfy Rule 56(e) and are therefore insufficient to create a genuine issue of material fact either that plaintiff engaged in any racist practices or that defendant demoted him for doing so.

Based on the record before me, no reasonable jury could conclude that plaintiff committed any racially discriminatory acts or that defendant demoted him for committing such acts. A reasonable jury would be compelled to find that plaintiff was demoted solely because of his religious

beliefs. Therefore, the accommodation analysis is inapplicable. Further, based on the direct evidence of discrimination, plaintiff's motion for summary judgment on the issue of liability must be granted.

**THEREFORE, IT IS ORDERED** that defendant's motion for summary judgment is **DENIED.**

**IT IS FURTHER ORDERED** that plaintiff's motion for summary judgment on liability is **GRANTED.**

**FINALLY, IT IS ORDERED** that the court will hold a telephonic status conference on June 17, 2002 at 11:00 am. The court will initiate the call.