Michael R. CUENCA, Plaintiff,

v.

UNIVERSITY OF KANSAS, Myron A. Kautsch, Individually, and James K. Gentry, Individually, Defendants.

No. 98–4180–SAC.

United States District Court, D. Kansas.

May 9, 2003.

Richard C. Evans, Schroer, Rice, Wisler & Morton, PA, Lawrence, KS, Michael B. Myers, Victorville, CA, James L. Wisler, James L. Wisler Law Offices, Lawrence, KS, for Plaintiff.

Rose A. Marino, University of Kansas General Counsel, Lawrence, KS, Barbara L. McCloud, Snell & Wilmer L.L.P., Phoenix, AZ, for Defendants.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This is a civil rights employment case, filed by an assistant professor whose employment at the University of Kansas has been terminated. It comes before the court on the following motions: plaintiff's motion for summary judgment or partial summary judgment (Dk.183); defendant's

motion for summary judgment (Dk.192); defendant's motion for leave to substitute corrected memorandum (Dk.196); defendant's motion to strike plaintiff's affidavit (Dk.199); and plaintiff's motion for leave to file a surreply (Dk.208). The court finds it expedient to rule upon the latter three motions before addressing the summary judgment motions.

### I. Defendant's motion for leave to substitute corrected memorandum

By this motion, defendant seeks to substitute a corrected memorandum of law in support of its motion for summary judgment. Its original memorandum exceeded this court's page limitation and contained a factual error.[1] Specifically, the original memorandum was two pages over the required maximum, and incorrectly stated that another professor was given a raise in the amount of $180.00, an amount identical to the raise given plaintiff, instead of the correct amount of $650.00.

Plaintiff objects to the substitution, but shows no prejudice in the event the motion is granted. In the interest of having an accurate record and finding no prejudice to plaintiff, the court grants defendant's motion to substitute the corrected memorandum.

### II. Plaintiff's motion for leave to file a surreply

 Under D. Kan. Rule 7.1(b), parties are permitted to file a dispositive motion, a response to the motion, and a reply by the movant. The rules do not permit a surreply. However, the nonmoving party is to be given notice and a reasonable opportunity to respond to the movant's summary judgment materials. *See* Fed. R.Civ.P. 56(c). Thus, when a reply advances new reasons or evidence in support of a motion for summary judgment, the nonmoving party is usually granted an opportunity to respond. *See e.g. Stevens v. Deluxe Financial Services, Inc.,* 199 F.Supp.2d 1128 (D.Kan.2002).

Plaintiff has sufficiently met this burden by showing that he had no opportunity to address certain subjective reasons asserted by defendant in its response as a justification for plaintiff's treatment. Thus the court will allow plaintiff's short surreply and will consider the arguments presented therein.

### III. Defendant's motion to strike plaintiff's affidavit

 Defendant requests that the court strike plaintiff's affidavit, or numerous specified paragraphs included therein, because the statements are not within plaintiff's personal knowledge, are conclusory, constitute inadmissible hearsay, or are irrelevant, all in violation of the governing rules. *See* Fed.R.Civ.P. 56(e); D. Kan. R. 7.6; 56.1. Plaintiff counters that the sole grounds for striking an affidavit is when it contradicts one's prior sworn testimony, creating a sham issue of fact, pursuant to *Franks v. Nimmo,* 796 F.2d 1230 (10th Cir.1986).

Plaintiff's assertion is incorrect, as motions to strike are both proper and frequently made on other grounds. *See e.g., Noblett v. General Elec. Credit Corp.,* 400 F.2d 442, 445 (10th Cir.), *cert. denied,* 393 U.S. 935, 89 S.Ct. 295, 21 L.Ed.2d 271 (1968) (affirming a motion to strike an affidavit for violation of Rule 56(e)). Defendant's motion to strike plaintiff's affidavit for violation of Rule 56(e) is not improper.

---

**1.** Defendant contends that the error was a "typographical error" but the reason for the misstatement is immaterial.

Plaintiff's affidavit forms the sole support for his asserted facts in opposition to defendant's summary judgment motion and in support of his own summary judgment motion. This affidavit (Dk.185–191) consists not only of 248 separate paragraphs, many of which contain multiple sentences, but also of seven attachments, one of which (Appendix B) contains 169 other exhibits, totaling 645 pages. The affidavit and its attachments are voluminous.

Because of the size of the affidavit and its attachments, the task of deciding the motion to strike on its merits would take nearly as much of the court's resources as would deciding the parties' substantive motions. Further, granting defendant's motion to strike plaintiff's affidavit *in toto* would have the effect of granting defendant's motion for summary judgment and denying plaintiff's motion for summary judgment. The court declines to strike plaintiff's affidavit in its entirety.

Defendant also requests that the court strike the offending paragraphs thereof. The court grants this motion, and will disregard the inadmissible portions of the challenged affidavit, *i.e.*, all statements that do not comply with Rule 56(e). *See Lee v. National Life Assurance Co. of Canada*, 632 F.2d 524, 529 (5th Cir.1980). Thus defendant's motion to strike defendant's affidavit is denied in part and granted in part.

IV. Motions for summary judgment

Many of the issues raised in defendant's motion for summary judgment are identical to those in plaintiff's motion for summary judgment. To the extent separate issues are raised, they will be addressed separately.

● Summary Judgment Standards

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Industries, Inc.*, 939 F.2d 887, 891 (10th Cir.1991)).

The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* At the same time, a party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.,* 45 F.3d 357, 363 (10th Cir.1995). "[I]t is not enough that the nonmovant's evidence be merely colorable or anything short of significantly probative." *Revell v. Hoffman,* 309 F.3d 1228, 1231 (10th Cir.2002) (citations and quotations omitted).

● Statement of Uncontroverted Facts

Plaintiff was first hired at Kansas University (KU) on August 16, 1994, as an Assistant Professor of Visual Communications in the School of Journalism ("the J–School"). Plaintiff's birth certificate states his father's race as "Filipino." (PTO, p. 21.) At the time plaintiff was hired, the Dean of the J–School was Myron A. Kautsch, a defendant in this case.

Plaintiff was employed as a tenure-track professor. His general employment responsibilities included teaching, researching or engaging in creative activity related to design and multi-media technology, and performing service to the J–School, KU and the academic profession.

In the fall of 1994, plaintiff was assigned to teach two courses, even though the J–School expected faculty to teach three courses a semester. In 1995, plaintiff was again assigned to teach two classes, but volunteered to teach a third class. Plaintiff regretted that decision because of the work load demanded by the courses, and the number of students involved.

In June of 1995, Kautsch gave plaintiff his annual evaluation for 1994. Plaintiff received a rating of "good." During the fall of 1995, plaintiff sent three letters complaining of his teaching load to several individuals. On December 7, 1995, plaintiff wrote a self-evaluation, at the request of Kautsch, outlining his performance as a faculty member to date, expressing his anger, and criticizing the J School administration for not recognizing his record of accomplishments. Kautsch responded soon thereafter to plaintiff's concerns regarding his teaching load, and plaintiff sent Kautsch a note thanking Kautsch for his patience in dealing with plaintiff.

Based on plaintiff's demands and the J–School's inability to meet them, Kautsch considered sending a notice of non-reappointment to plaintiff in 1995. On December 18, 1995, Kautsch responded to plaintiff's self-evaluation by a detailed written letter, and on that same date notified plaintiff that although he was not being given notice of non-reappointment for the end of 1995–1996, he was "on notice to expect non-renewal of [his] appointment at the end of the 1996–1997 academic year," unless certain stated terms relating to performance were met, and he was subject to performance evaluation by the J–School. DE 54.

Other letters were exchanged between Kautsch and plaintiff regarding plaintiff's objections and concerns about his position, and plaintiff's teaching load was adjusted as plaintiff had requested for the spring 1996 semester.

In March of 1996, Kautsch informed the faculty that unclassified employee Gary Hawke's position as General Manager of the student operated radio station would be changed from a nine-month position to a twelve-month position, would be renamed "Integrated Media Lab General Manager," and would be given the added responsibilities of supervisor of all media labs within the J–School. This position was not a faculty position or a tenure-track position, and neither plaintiff nor others were given the opportunity to apply for it.

In May of 1996, Kautsch gave plaintiff his annual evaluation for 1995, which rated

plaintiff "poor to adequate," and awarded plaintiff a merit increase of $180. At that same time Kautsch gave a white male in the J–School, Paul Wenske, a rating of "adequate," and awarded him a merit increase of $650. Kautsch considered non-renewing both plaintiff and Wenske. In June of 1996, plaintiff sent Kautsch a letter objecting to his evaluation, asking for an explanation of it, and stating his intent to appeal.

Later that summer, Kautsch advised Provost David Schulenburger that he was resigning his position as Dean of the J–School. The Provost accepted Kautsch's resignation and acknowledged that Kautsch would continue as Dean of the J–School during the 1996–97 academic year while a national search was conducted for a new dean.

Sometime during the fall semester of 1996, plaintiff began actively participating as a member and/or leader of various civil rights groups.

In October of 1996, Kautsch sent plaintiff an explanation of his evaluation. Kautsch maintained plaintiff's rating of "poor to adequate," but gave plaintiff $320 salary in addition to the $180 plaintiff had previously been awarded. Although Kautsch did not forward the document to plaintiff, Kautsch had conducted a lengthy and detailed reconsideration of plaintiff's 1995 performance evaluation.

On some unspecified date prior to February 19, 1997, plaintiff met with Maurice Bryan, KU's Director of Equal Opportunity, to discuss his concerns about Kautsch. On February 19, 1997, plaintiff wrote a letter to Bryan, stating in part: "I am filing a discrimination complaint with the Kansas Human Rights Commission against the School of Journalism and the University, based on my mistreatment since my employment in August of 1994." The letter did not state whether plaintiff's complaint had been filed, or if so, whether it alleged race discrimination, retaliation, or some other basis, but it stated that it enclosed copies of portions of the complaint.

On March 17, 1997, Bryan sent Kautsch a copy of plaintiff's "racial discrimination complaint," requested Kautsch's response, and stated Bryan's intent to conduct an investigation of plaintiff's complaints. Kautsch responded at the end of the month, and Bryan acknowledged his receipt thereof, stating in part: "normally, when we have an external complaint we let that process play itself out. However, at this point, I still wish to see if we can resolve this in-house." DE 135. On or about April of 1997, plaintiff filed complaints with the EEOC and KHRC,[2] charging KU with racial discrimination and retaliation. (PTO stipulation, p. 21.)

By letter dated June 3, 1997, Bryan advised Kautsch that he had "confirmation of the mediation phase of the Kansas Human Rights Commission, and since that phase is very similar to our initial process, I have decided to suspend" any internal efforts to resolve plaintiff's discrimination complaint. DE 136. The internal investigation at KU was not thereafter reopened.

In July of 1997, James K. Gentry, a defendant in this case, became the new Dean of the J–School, and soon thereafter responded to a note by plaintiff, confirming that he was aware of plaintiff's discrimination complaint.

---

**2.** No KHRC complaint is included in the record. It appears from statements in the briefs that plaintiff may have originally complained of race discrimination and/or retaliation, then later amended his complaint to include national origin discrimination. For ease of reference, the court will refer to plaintiff's discrimination claim(s) as race discrimination, rather than as national origin discrimination, the analysis of the two being the same.

That same month, Gentry notified the J–School faculty of funding for a position of New Media Leader. The day plaintiff received such notice, he responded that he believed he had been hired to fill such a role. Gentry replied that he had not been informed of such, but that plaintiff was welcome to apply for the position. Gentry did not believe that plaintiff's position was the same as described for the New Media Leader position. Gentry told plaintiff that he would be "creating a search committee, position description, etc., as with all university searches," to conduct an outside search for a New Media Leader, and began advertising in August of 1997. Plaintiff applied for the position. Bryan reviewed his paperwork and determined that plaintiff was qualified for the position, and so informed Gentry. Plaintiff was found to be a qualified candidate but did not receive an interview. All other qualified candidates, three white males, received interviews. *See* pl. exh. B, p. 262, Exh. 77. None of those persons was selected for the position, and the search for a New Media Leader was closed without the position having been filled.

In October of 1998, plaintiff filed suit in this case, alleging race-based discrimination and retaliation against KU, Kautsch and Gentry.

In 1998, plaintiff's record was given a pre-tenure review by the J–School's Promotion and Tenure Committee ("Tenure Committee"), as was the record of a white male colleague. On January 23, 1999, Gentry provided plaintiff a memorandum relating to that review, noting that the school committee's pre-tenure review process was new, and "should in no way be construed as having the weight of a formal pre-tenure review." DE 155. It noted several areas where plaintiff could strengthen his record in anticipation of the promotion and tenure process.

In February of 1999, Ted Fredrickson, Chairman of the News and Information faculty at the J–School, and plaintiff exchanged several e-mails. One contains plaintiff's statement, "You once warned me that playing the race card in this workplace would cost me." Fredrickson's e-mail in response stated, "that line about me supposedly warning you that it would cost you dearly to play the race card is fiction. What I DID tell you, and what I still believe to be true, was that to my knowledge, race was never a factor in how you were treated in the School of Journalism by Mike Kautsch or anyone else. And I say that as someone who disagreed in a very public way with how you (and Paul Wenske and others) were treated by the previous administration in this school." DE 186. Plaintiff replied that Fredrickson's exact words were: "If you ever use race as an issue in this, you'll lose what little support you have here."

In April of 1999, Gentry advised plaintiff that he would be going through the promotion and tenure process in the 1999–2000 academic year and provided plaintiff a timeline for that process. Plaintiff was aware of the J–School's standards for promotion and tenure.

Plaintiff gave Gentry a draft of his record, using the "Blue Form," and included the names of four individuals plaintiff recommended as external reviewers, one of whom was Mr. Hoy. Gentry sent a selection of plaintiff's materials to selected external reviewers, two of whom had been proposed by plaintiff, but Gentry failed to send copies of the book chapters plaintiff had written. When this omission was brought to Gentry's attention, he sent the book chapters to the external reviewers, with a follow-up letter. Although some reviewers had sent their evaluations to Kautsch before receiving and reviewing plaintiff's book chapters, Kautsch asked

each of them whether the book chapters affected their evaluation, and each replied negatively. Def's Exh. M, Bates # 30736.

On December 14, 1999, the J–School's committee on promotion and tenure notified plaintiff that they had "voted overwhelmingly to deny" his tenure and promotion because his teaching, research/creative performance, and service were not deemed sufficient. Possible ratings for performance in each of those categories were: exceptional, very good, good, adequate, and poor. The committee rated plaintiff's teaching as good, his research and creative performance as poor, and his service as poor. DE 167. The letter states, among other matters, that the decision was based solely on plaintiff's performance as an assistant professor.

Gentry concurred with the J–School's committee's 12–2[3] recommendation not to extend tenure or promotion to plaintiff, and, pursuant to plaintiff's request, plaintiff's materials were forwarded on December 27, 1999, to the University Committee on Promotion and Tenure. A cover letter by the chair of the J–School's committee on promotion and tenure to the University Committee on Promotion and Tenure specified plaintiff's failings. DE O.

On February 25, 2000, KU's student newspaper published a statement from Journalism Professor Frederickson, the chairman of the news and information sequence, which referred to plaintiff.

After conducting a review of plaintiff's materials, the University Committee on Promotion and Tenure notified plaintiff by letter dated March 26, 2000, that he had not been recommended for promotion and tenure by that committee, and that his appointment for 2000–2001 would be a terminal appointment. Plaintiff was one of eight individuals not recommended for promotion and tenure at KU at that time.

On March 29, 2000, plaintiff received a sanction of warning from the Provost for an "egregious" failure to meet his academic responsibilities, related to his cancellation of certain classes. DE 246. During the first eight weeks of that spring semester, plaintiff had missed 31 % of his classes in one course, and 37.5 % of his classes in another course for the stated reason that he was attending another professor's employment discrimination trial in federal court, which he encouraged his students to attend as well.

In April of 2000, plaintiff filed a complaint of discrimination regarding his denial of tenure with Bryan, KU's Director of Equal Opportunity, but was told that jurisdiction over promotion and tenure decisions resided with KU's Committee on Tenure and Related Problems. In or about August of 2000, plaintiff filed a second complaint with the KHRC/EEOC alleging national origin-based discrimination and retaliation against KU.

In September of 2000, plaintiff requested a second review for promotion and tenure and that his notice of terminal appointment be rescinded. Plaintiff then went through the promotion and tenure peer review process a second time during the 2000–2001 academic year, but was subsequently informed that he had not been recommended for tenure and promotion and that his terminal appointment for that academic year would not be rescinded. Plaintiff's appeal of that decision was denied.

● Analysis and Authorities

1. Timeliness

The court first considers defendant's contention that plaintiff's claims based on acts which occurred prior to June 8, 1996, are untimely because they occurred more

---

**3.** One exhibit shows that the recommendation was 12–2, but another represents it as 12–1.

than 300 days before plaintiff first filed his KHRC claim. Plaintiff counters that all claims are timely because of the continuing violation doctrine.

Given the surprising absence in the record of copies of plaintiff's KHRC claims or other specific evidence showing which claims were made on which dates, coupled with recent changes in the law, *see Boyler v. Cordant Technologies, Inc.,* 316 F.3d 1137, 1139–40 (10th Cir.2003), the court declines to base its ruling upon this theory, preferring to examine the merits of the claims.

### 2. Evidentiary issues

Before the court examines the merits of the motions, it will first examine certain legal and evidentiary issues raised by the pleadings and their attachments.

Direct Evidence

■ Although the court will not address each legal error in plaintiff's briefs, it must briefly address plaintiff's erroneous assertion that this case should be controlled by a direct evidence analysis. "Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons." *Danville v. Regional Lab Corp.,* 292 F.3d 1246, 1249 (10th Cir.2002). Direct evidence is that "which if believed, proves the existence of a fact in issue without inference or presumption." *Kerr v. Valdez,* 55 Fed. Appx. 491, 494–95, 2002 WL 31895062 (10th Cir. 2002), quoting *Shorter v. ICG Holdings, Inc.,* 188 F.3d 1204, 1207 (10th Cir.1999) (further quotation omitted); *see Bedell v. American Yearbook Co., Inc.* 17 F.Supp.2d 1227, 1230–31 (D.Kan.1998).

■ Direct evidence is rarely present in a discrimination case. *Daniel v. Loveridge,* 32 F.3d 1472, 1476 (10th Cir.1994). To constitute direct evidence, the evidence must be from the decision-maker, must relate directly to the adverse action at issue, and must contain an acknowledg-

ment of discriminatory intent or reveal a propensity to make decisions based on unlawful criteria. *See Peterson v. Wilmur Communications, Inc.,* 205 F.Supp.2d 1014, 1024 (E.D.Wis.2002) (citing cases); *Kendrick v. Penske Transp. Services, Inc.,* 220 F.3d 1220, 1225 (10th Cir.2000); *Chatfield v. Shilling Const. Co., Inc.,* 232 F.3d 900, 2000 WL 1531846, *2 (10th Cir.2000). For example, direct evidence is found where a letter of demotion from the decision maker states that because plaintiff is "a member of the World Church of the Creator, a White supremacist political organization … employees cannot have confidence in the objectivity of [his] training, evaluation, or supervision when [he] must compare Whites to non-Whites." *Peterson,* 205 F.Supp.2d at 1024.

In this case, plaintiff has not identified any document or statement directly linking any adverse action to his race. Direct evidence of prohibited discrimination or retaliation in the decisions affecting plaintiff is not found in Hoy's statement as an outside reviewer in 1999, Kautsch's statements in 1995, Frederickson's newspaper statements in 2000, Gentry's failure to forward plaintiff's book chapters to outside reviewers, or in any other evidence of record. Accordingly, plaintiff's claims must be proved, if at all, by indirect evidence.

Statistics

■ The court also initially addresses certain statistical evidence proposed by plaintiff, which the court discounts. Plaintiff shows the court various statistics in an attempt to show a pattern and practice of racial discrimination at KU. It is true that, "statistics alone may be used to establish a prima facie case of racial discrimination in a disparate treatment case," *McAlester v. United Air Lines, Inc.* 851 F.2d 1249, 1258 (10th Cir.1988), citing cases. Plaintiff makes no attempt, however, to show the statistical comparison of the percentage of

minorities terminated with their percentage in the work force of KU, or within the J–School. Plaintiff refers to the poor retention rate of minorities, apparently at KU, but those statistics apparently include those who leave for reasons other than termination. Plaintiff compares the small percentage of Hispanics in KU's faculty to the percentage of Hispanics in Kansas, instead of to those Hispanics qualified to serve on KU's faculty.

Plaintiff's statistics fail to show the number of individuals of plaintiff's race, if any, who were denied tenure by the J–School or the number of ethnic minorities in general that have applied for tenure with KU. *See Doan v. Seagate Tech., Inc.*, 82 F.3d 974, 979 (10th Cir.1996) ("While statistical evidence may create an inference of discrimination, the evidence may be so flawed as to render it insufficient to raise a jury question."). In short, plaintiff's irrelevant comparisons preclude any effective use of the offered statistics.

OFCCP

The court similarly discounts plaintiff's proposed evidence of KU's non-compliance with the Office of Federal Contract Compliance Programs ("OFCCP"). The parties stipulated in the pretrial order that during 1995, KU was found to be out-of-compliance with Executive Order 11246 by the OFCCP. Plaintiff submits some evidence relating to this violation in support of his pattern and practice allegations. *See* plaintiff's App. B, Exh. 132 (referencing three violations: failing to submit a summary of the results of KU's prior year affirmative action placement; inadequate record keeping in applicant flow, hiring and promotion personnel activity data; and, inadequate identification of problem area of underutilization of minorities and females).

After reviewing the exhibits, the court cannot determine whether KU's 1995 lack of compliance was due even in part to substantive violations, or whether it was instead due only to procedural failings in KU's manner of reporting or record keeping. Accordingly, the relevance of this evidence has not been shown.

### 3. Legal Standards

McDonnell Douglas framework

■■■■ *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) provides the framework for analyzing circumstantial evidence under Title VII, as well as § 1981 claims and § 1983 claims based on allegations of racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. *Kendrick v. Penske Transp. Services*, 220 F.3d 1220, 1226 n. 4 (10th Cir.2000); *See Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir.1999).

Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of wrongful termination, by showing that: "(1) she belongs to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge." *Id.* at 1135. Upon such a showing, a rebuttable presumption arises that her discharge was motivated by unlawful discrimination. The burden then shifts to the employer to rebut the presumption by articulating a legitimate, nondiscriminatory reason for the termination. Thereafter, the burden reverts to the plaintiff, who may avoid summary judgment only by showing that a factual dispute exists whether the employer's articulated reason was pretextual. *See id.*

*Chatfield v. Shilling Const. Co., Inc.*, 232 F.3d 900, 2000 WL 1531846, *2 (10th Cir. 2000).

**Failure to promote—race**

■ To carry the initial burden of establishing a prima facie case of race discrimination for a failure to promote claim, the plaintiff must typically show that he or she (1) belongs to a minority group; (2) was qualified for the promotion; (3) sought but did not receive the promotion; and (4)the position was filled with a non-minority or remained available following the decision not to promote him.

See *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1195 n. 6 (10th Cir. 2000); *Amro v. Boeing Co.*, 232 F.3d 790, 796 (10th Cir.2000).

Defendants "concede that plaintiff is a member of a protected class." (Dk. 196, corrected memo, p. 21.) This concession is coupled with the absence in the record of any claim that defendants lacked knowledge of plaintiff's minority status at the time of the events giving rise to this action. Viewed in the light most favorable to plaintiff, defendants knew of plaintiff's minority status at all times relevant to this case.

**Retaliation Claim.**

■ Title VII makes it an unlawful employment practice "for an employer to discriminate against any of his employees ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Section 2000e–2(a) lists actions that can constitute discrimination, specifying a refusal to hire, a discharge, or any discriminatory treatment with respect to "compensation, terms, conditions, or privileges of employment." The three-pronged burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to plaintiff's claims. In the absence of direct evidence, a prima facie case of retaliation requires a plaintiff to show that (1) he engaged in protected opposition to discrimination; (2) he was subjected to adverse employment action by the employer; and (3) a causal connection exists between the protected activity and the adverse action. See *McCue v. Kansas, Dep't. of Human Resources*, 165 F.3d 784, 789 (10th Cir.1999). "If a prima facie case is established, the burden of production shifts, and the defendant must articulate a legitimate, nondiscriminatory reason for the adverse action." *Purrington v. University of Utah*, 996 F.2d 1025, 1033 (10th Cir.1993). If the employer offers such a reason, the plaintiff may survive summary judgment by showing that there is a genuine dispute of material fact as to whether the proffered reason for the challenged action is pretextual. See *Richmond*, 120 F.3d at 208.

■ *Trujillo v. New Mexico Dept. of Corrections*, 182 F.3d 933, 1999 WL 194151, *2 (10th Cir.1999). The absence of a reference to unlawful discrimination "can preclude a retaliation claim because an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII." *Petersen v. Utah Dept. of Corrections*, 301 F.3d 1182, 1188 (10th Cir. 2002).

**Retaliation based on opposition to discrimination**

■ Opposition to an employer's conduct is protected by § 2000e–3(a) only if it is opposition to a "practice made an unlawful employment practice by [Title VII]." Opposition could be protected even if a person were wrong about whether another had in fact engaged in a violation of Title VII; it would be enough if he had a "good faith belief that Title VII ha[d] been violated." *Love v. Re/Max of Am., Inc.*, 738 F.2d 383, 385 (10th Cir.1984). *Petersen*, 301 F.3d at 1188.

Adverse Employment Action

■ Conduct is adverse employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998).

Traditionally, the Tenth Circuit has not required that adverse action be material, and has not limited that term to mean only monetary losses in the form of wages or benefits. *Jeffries v. Kansas,* 147 F.3d 1220, 1232 (10th Cir.1998). Recent Tenth Circuit cases seem to have adopted a materiality requirement, however, in stating:

> "Although the Tenth Circuit liberally defines an 'adverse employment action,' its existence is determined on a case by case basis and does not extend to a mere inconvenience or an alteration of job responsibilities." *Heno v. Sprint/United Mgmt. Co.,* 208 F.3d 847, 857 (10th Cir. 2000) (internal quotation marks and citation omitted). The employer's retaliation must be "materially adverse employment action." *Sanchez v. Denver Pub. Schs.,* 164 F.3d 527, 533 (10th Cir. 1998).

*Petersen,* 301 F.3d at 1189; *see also Mallinson–Montague v. Pocrnick,* 224 F.3d 1224, 1232 (10th Cir.2000) (finding evidence sufficient to demonstrate that the adverse employment action was "significant, material, and tangible.")

The Tenth Circuit recently held that an involuntary lateral transfer, without more, does not constitute an "adverse employment action" where the transfer merely increased the employee's commute and did not alter her salary, benefits, or teaching responsibilities, and the transfer was prompted by decreasing student enrollment. *See Sanchez,* 164 F.3d at 532. Similarly, the Tenth Circuit found as a matter of law that plaintiff's removal from the graduate faculty and student dissertation committee did not constitute adverse employment actions where the University's actions had a de minimus effect on plaintiff's future employment opportunities, were normal incidents of the denial of tenure and merely altered her job responsibilities in the last months of her employment. *See Aquilino v. Univ. of Kan.,* 268 F.3d 930 (10th Cir.2001). *See generally Meiners v. University of Kansas,* 239 F.Supp.2d 1175, 1191 (D.Kan.2002).

■ Speculative harm does not constitute adverse employment action. *See Trimmer v. United States Dep't of Labor,* 174 F.3d 1098, 1103–04 (10th Cir.1999). Where a plaintiff presents no evidence of adverse action apart from his own conclusory allegations, summary judgment is appropriate. *See Aquilino,* 268 F.3d 930 (finding no adverse action in KU's removal of plaintiff as co-chair of a dissertation committee, denial of ad hoc faculty (volunteer) status, or denial of adjunct research associate position, all after plaintiff had been denied tenure).

### 4. Race Discrimination/Retaliation in Terms and Conditions, Failures to Transfer

■ Viewed in the light most favorable to plaintiff, plaintiff's letter to Bryan dated February 19, 1997, was the first notice defendant had of plaintiff's complaint of race discrimination and/or retaliation. Although plaintiff had complained previously of disparate treatment, such complaints reflected dissatisfaction with plaintiff's teaching load, and have not been shown to have related to plaintiff's race or protected conduct. Although plaintiff participated in various civil rights groups in and after 1996, even assuming plaintiff's association with such groups constitutes protected conduct, no evidence as to defendant's

knowledge of that conduct prior to February of 1997 has been shown.

The court further finds that many of the events of which plaintiff complains are insufficient to constitute the requisite adverse action, regardless of any materiality requirement.

Threat to Terminate / Special review

■■■■■ Kautsch considered non-reappointing plaintiff in December of 1995. *See* Pl.App. B, Exh. 168. This did not significantly affect plaintiff's employment status or benefits, however, because Kautsch did reappoint plaintiff at that time. *See Id.* The same is true for Kautsch's "threat" to place plaintiff on a special review. Although that action was contemplated, *see* Pl.App. B., Exh. 196, plaintiff has failed to show that it was ever undertaken. " 'Unsubstantiated oral reprimands' and 'unnecessary derogatory comments' such as those alleged here are not included within the definition of adverse action absent evidence that they had some impact on the employee's employment status." *Sanchez,* 164 F.3d at 533. Plaintiff's assertion that this special review required him to keep his mouth shut about any of his employment concerns, under threat of termination, (Pl.App.B), is unsupported by the record.

Discipline for failing to conduct classes

■■■■ On March 29, 2000, plaintiff received a sanction of warning from the Provost for an "egregious" failure to meet his academic responsibilities, related to his cancellation of certain classes. DE 246. During the first eight weeks of that spring semester, plaintiff had missed 31 % of his classes in one course, and 37.5 % of his classes in another course, for the stated reason that he was attending another professor's employment discrimination trial in federal court. Plaintiff does not contend that the contents of the letter are untrue, but complains that the sanction was moti-

vated by illegal animus, and constitutes disparate treatment because Kautsch and Gentry were not disciplined for their alleged violations of KU's code of conduct.

This letter did not effect a significant change in plaintiff's employment status or benefits, and was merely a warning. No evidence has been shown that this letter of reprimand had any negative effect on his employment, or was considered by anyone in preparing plaintiff's evaluation or deciding on his promotion and tenure. Thus no reasonable jury could conclude that this written reprimand is sufficient to constitute an adverse action. *Cf. Roberts v. Roadway Exp., Inc.,* 149 F.3d 1098, 1104 (10th Cir.1998) (written warnings constituted adverse actions where evidence demonstrated that the more warnings an employee received, the more likely he or she was to be terminated for a further infraction).

■■■ Further, plaintiff has neither shown that either Kautsch or Gentry violated KU's faculty code of conduct, as alleged, nor shown that such violations, if any, were of comparable seriousness to plaintiff's repeated failure to conduct class to warrant a similar sanction. Thus plaintiff has not shown that he was treated any differently than his comparators.

Suspension of internal investigation

■■■ The decision to suspend KU's internal investigation of plaintiff's complaints of race discrimination and/ or retaliation was not made by Kautsch or anyone involved in the decisions relative to plaintiff's employment who are the particular targets of plaintiff's speculations of a retaliatory animus. Instead, the investigation was initiated and, several months thereafter, suspended by Bryan, KU's Director of Equal Opportunity. It is uncontroverted that Bryan made this decision because he had confirmation of the mediation phase of the

KHRC, which phase is substantially similar to KU's initial process. This is not, as plaintiff asserts, the same as suspending the internal investigation because of "failed mediation." The record shows that Bryan suspended the internal investigation because internal efforts had been unfruitful, because he believed that further efforts would be futile, and because KU would participate in the KHRC process. *See* Dk. 186, plaintiff's App. B, p. 206–211. KHRC's investigation was not impeded and proceeded to a conclusion, although one unfavorable to plaintiff.[4]

Plaintiff has shown no adverse action in KU's decision not to conduct a parallel investigation. *See Dean v. The Boeing Co.,* 195 F.Supp.2d 1280 (D.Kan.2002)(alleged failure to investigate internal racial discrimination complaint was not actionable because it did not constitute substantial adverse employment action, as required to support a Title VII retaliation claim.), *aff'd* 61 Fed.Appx. 576, 2003 WL 1439623 (10th Cir.2003). Nor has plaintiff shown that had KU conducted an internal investigation, its conclusion would have been any different than the 'no probable cause' finding reached by the KHRC.

Exclusion from meetings

Plaintiff contends that defendant Gentry took adverse action against him by excluding him from important meetings. Plaintiff contends that Gentry did so by either not informing him of such meetings, or by scheduling them at times plaintiff could not attend. Plaintiff's lack of specificity on this claim prevents the court from much analysis thereof. The court finds that plaintiff has failed to show that Gentry's acts of excluding plaintiff from meetings, if any, were motivated by plaintiff's race or protected conduct, and has failed to show

that such exclusions were significant enough to constitute adverse action.

Integrated Media Lab General Manager

■ The court next addresses defendant's failure to consider plaintiff for the position of "Integrated Media Lab General Manager" in March of 1996. It is uncontested that this position was not a faculty or tenure track position. To view that position as a promotion for plaintiff, or even as a lateral transfer from the faculty, tenure-track position plaintiff already held, would turn academia upside down. The court thus considers this as a failure to demote claim, which under these circumstances, is not actionable under Title VII. Alternatively, plaintiff has not shown that he was qualified for that position.

■ Plaintiff's claim of retaliation based upon this event also fails. Failing to consider plaintiff for a demotion does not constitute adverse employment action, and defendant's non-consideration of defendant for the position of "Integrated Media Lab General Manager" has not been shown to be adverse to plaintiff in any way. The fact that the plaintiff views the transfer positively does not of itself render the denial of the transfer adverse employment action. *See, e.g., Doe v. Dekalb County Sch. Dist.,* 145 F.3d 1441, 1449–50 (11th Cir.1998) (collecting cases). Additionally, this event occurred approximately eleven months before plaintiff's protected conduct, precluding the requisite causal connection.

May 1996 pay raise/evaluation

■ Plaintiff correctly contends that in May of 1996, Kautsch gave him the lowest salary increase of any other tenure-track faculty member in the J–School, and a low

---

**4.** On June 11, 1998, the KHRC issued a "No Probable Cause" finding on plaintiff's com- plaint.

evaluation. Plaintiff contends this evidences racial discrimination and retaliation.

Plaintiff is correct that his evaluation was lower than any other tenure-track faculty member. Plaintiff has not shown, however, that anyone who received an identical rating on his or her evaluation received a higher raise than he did. Plaintiff has shown only that his salary increase is less than plaintiff desired and less than that awarded to others who received better evaluations. Because he has not shown that he was treated differently than any comparator, plaintiff fails to make a prima facie case of race discrimination either in his low evaluation, or in the correspondingly low amount of raise he received.

Similarly, plaintiff fails to make a prima facie case of retaliation because this evaluation occurred before plaintiff's protected activity, preventing the requisite causal connection, and because receipt of a raise, although minimal in amount, has not been shown to constitute adverse action.

New Media Leader

 Plaintiff has shown that he applied for an available position of new media leader in October of 1997, and was found to meet the stated qualifications for that position, as were three white males. The three white males were interviewed, but defendant was not, purportedly because the white males were better qualified. Plaintiff thus meets the first three elements of a prima facie case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817 (enumerating the following elements required in order for a plaintiff to establish a prima facie case in the failure to hire context: (1) plaintiff belongs to a protected class; (2) plaintiff "applied and was qualified for a job for which the employer was seeking applicants"; (3) despite being qualified, the plaintiff was rejected; and (4) after plaintiff's rejection,

"the position remained open and the employer continued to seek applicants from persons of [plaintiff's] qualifications.")

Defendant alleges solely that the plaintiff has failed to meet the fourth element, above. Defendant has presented uncontradicted evidence that no one was hired to fill the position of new media leader, although interviews were conducted. Plaintiff does not allege that the position remained open or that the defendant continued to seek applicants for that position, choosing instead to dispute the legal requirement imposed by the fourth element. Because of plaintiff's failure to meet the fourth element, plaintiff fails to make a prima facie case of race discrimination.

Plaintiff's claim of retaliation meets the same fate. Plaintiff has failed to show that he suffered any adverse action in not receiving this position, as it was a temporary, two-year, non-tenure track appointment. Additionally, because this event occurred approximately eight months after plaintiff's protected conduct, it lacks the close temporal proximity necessary to show a causal connection, in the absence of other factors.

In short, plaintiff's claims of discriminatory or retaliatory terms and conditions of employment and of failure to transfer or promote, as addressed above, fail to raise a material question of fact. The court separately addresses plaintiff's claims relating to his denial of promotion and tenure, below.

5. Denial of Promotion and Tenure

 A plaintiff's own conclusory opinions about his qualifications and another's racial animus do not give rise to a material factual dispute. *See Bullington v. United Air Lines*, 186 F.3d 1301, 1318 (10th Cir.1999). Evidence that one's qualifications for tenure, such as his research, were unfairly judged, coupled with the

plaintiff's own opinions about his qualifications do not give rise to a material factual dispute. *See Babbar v. Ebadi,* 216 F.3d 1086, 2000 WL 702428, *6 (10th Cir.2000) (Table).

■ The relevant inquiry in a Title VII discrimination action is not whether KU's "proffered reasons were wise, fair or correct," but whether KU "honestly believed those reasons and acted in good faith on that belief." *Bullington,* 186 F.3d at 1318 (citing *Sanchez v. Philip Morris, Inc.,* 992 F.2d 244, 247 (10th Cir.1993)).

> Federal courts are not particularly well-suited to the task of evaluating the criteria for successful tenured professors and are particularly ill-suited to determine the best candidates. *See id.* at 1318 n. 14. "We previously have recognized that ... when analyzing the pretext issue, [we] do not sit as 'super-personnel departments' free to second-guess the business judgment of an employer." *Id.* (quoting *Simms v. Oklahoma,* 165 F.3d 1321, 1330 (10th Cir.), *cert. denied,* 528 U.S. 815, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999)).

*Babbar,* 216 F.3d 1086, 2000 WL 702428, at *6.

■ Plaintiff was denied tenure because he did not receive the requisite number of votes from members of the relevant committees on Tenure and Promotion. The majority of internal reviewers and external reviewers did not view plaintiff's record favorably. Although no single reason or set of reasons can be provided as to why the committees voted as they did, in general they determined, based on all of the materials provided to them, that the breadth and depth of the plaintiff's research, creative performance, and service, considered in conjunction with the quality of his teaching, did not, in their best judgment, warrant an award of tenure. Plaintiff fails to show the court that any individual granted promotion and tenure was similarly situated, was held to a different standard, was significantly less qualified than plaintiff, or that the decision not to grant him tenure and promotion was based upon illegal motivation. Specific complaints raised by plaintiff are addressed below.

Failure to act

■ Several of plaintiff's complaints involve alleged omissions. Plaintiff contends that Gentry failed to remove from plaintiff's tenure dossier a letter written by an outsider reviewer, Frank Hoy, which refers to plaintiff's minority status. The portion of the letter which plaintiff finds objectionable states, about the material plaintiff submitted for promotion and tenure:

> At that point, Cuenca brings up a minority issue that, I believe, has no place in such a statement. Until this point I had no knowledge he was a minority. I edited out the last portion and produced a much more palpable, supportive statement beneficial to Cuenca.

Dk. 186, plaintiff's App. B, p. 445, Exh. 128. Mr. Hoy additionally stated, as part of his recommendation that plaintiff be denied tenure, that "the information contained in Cuenca's own voluntary statements can be taken as a forewarning of future attitude, perhaps even problems, when he is an Associate Professor with tenure." *Id.,* p. 446.

This outside reviewer was one selected by plaintiff and not by any defendant. Plaintiff's tacit assertion that Gentry had any authority, let alone any duty, to remove from plaintiff's dossier any statement submitted by an outside reviewer chosen by plaintiff is unsupported by the facts. No spectre of discrimination or retaliation is raised based upon the fact Hoy's statement remained a part of plaintiff's tenure package.

Adoptive admissions

▆▆▆ Plaintiff additionally contends that Hoy's statement as an outside reviewer in 1999, Kautsch's statements in 1995, and Frederickson's newspaper statement in 2000, evidence racial animosity, and that because such statements were not expressly disclaimed by the decision-making committees and KU's Provost and Chancellor, they were adopted by such committees. When determining whether a party has manifested a belief in the truth of a document, so as to constitute an adoptive admission, the test is:

> "whether the surrounding circumstances tie the possessor and the document together in some meaningful way." *Id.* (citations and internal quotation marks omitted). A document is sufficiently "tied" to the possessor "to the extent the adoptive party accepted and acted upon the evidence." *Id.*

*Wright–Simmons v. City of Oklahoma City,* 155 F.3d 1264, 1268 (10th Cir.1998), citing *Pilgrim v. Trustees of Tufts College,* 118 F.3d 864 (1st Cir.1997)(finding adoptive admission by college president who reviewed discrimination report by grievance committee, then implemented each of the report's recommendations, because president would not have so acted unless he accepted the report's conclusions as the truth.)

Plaintiff fails to show that any of the statements he claims defendants adopted were accepted by the decision makers who then acted in reliance upon those statements, instead of in reliance upon other factors. Accordingly, the court cannot consider any of those statements to be adoptive admissions.

"Fraud" by Gentry

▆▆▆ Plaintiff contends that Gentry's late submission to external reviewers of copies of the book chapters plaintiff had written constitutes "fraud," and, apparently, a violation of the faculty code of con-

duct. It is undisputed that when this omission was brought to Gentry's attention, Gentry sent the book chapters, one of which had just been published, to the external reviewers, with a follow-up letter. Although some reviewers had already sent their evaluations of plaintiff to Kautsch before receiving and reviewing the book chapters, all were specifically asked if the book chapters would have affected their evaluation, and replied negatively.

Plaintiff has not shown that Gentry's initial failure to submit plaintiff's book chapters was intentional, was related to plaintiff's race or protected conduct, or had any effect whatsoever upon the reviewers' assessment of whether plaintiff should receive promotion and tenure. The court thus finds that defendant has failed to present a prima facie case of retaliation, race or national origin discrimination, whether pursuant to Title VII, § 1981, or 1983. *See Drake v. City of Fort Collins,* 927 F.2d 1156, 1162 (10th Cir.1991) (stating a claim of intentional discrimination under 42 U.S.C. § 1983 is subject to the same methods of proof as an analogous claim under Title VII).

Legitimate business reasons

▆▆▆ Plaintiff has failed to produce any direct or circumstantial evidence that defendants, or any of them, acted with a discriminatory motive. Even assuming plaintiff established a Title VII prima facie case, defendants have articulated legitimate, nondiscriminatory reasons for their decisions. "Defendants need not prove that their nondiscriminatory reason is true or litigate the merits of their reason; they only need to provide a nondiscriminatory reason that is specific and clear." *Meiners,* 239 F.Supp.2d at 1194–95. Defendants have done so, as noted above.

No Pretext

▆▆▆ To overcome defendant's summary judgment motion, plaintiff must dem-

onstrate a factual question whether defendants' articulated reasons are a pretext for discrimination or retaliation. The relevant inquiry is not whether defendants' proffered reasons are correct, but whether defendants "honestly believed those reasons and acted in good faith upon those beliefs." *Bullington*, 186 F.3d at 1318. When examining the issue of pretext, the Court examines the facts as they appeared to the persons making the decision, *see Doebele v. Sprint Corp.*, 157 F.Supp.2d 1191, 1216 (D.Kan.2001), and does not second guess the business judgment of the employer, *see Simms v. Okla. ex rel. Dept. of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir.1999).

■ Plaintiff has not presented sufficient evidence to create a genuine dispute of material fact as to whether the defendants' proffered reasons are pretext for racial discrimination or retaliation. *See Falcon v. Trustees of State Colleges in Colorado*, 216 F.3d 1087, 2000 WL 779860, *5 (10th Cir.2000) (Table) (finding isolated comments not shown to be related to the decision to deny tenure insufficient to show pretext). Even assuming, *arguendo*, that KU misjudged plaintiff's qualifications or used questionable criteria in evaluating his promotion and tenure application, his work performance, or his applications for other positions, such evidence would not preclude summary judgment on his claims of race discrimination and retaliation, as no cognizable evidence of pretext has been presented.

Hostile Work Environment Claim

Plaintiff alleges that he was subjected to a hostile work environment at KU by defendants Kautsch and Gentry, and Prof. Frederickson, based on acts detailed in the statement of facts above. Specifically, plaintiff contends that a "hostile" article written by Frederickson in the student newspaper on February 25, 2000, evi-

dences racial harassment. *See* plaintiff's App. B, p. 428, Exh.122.

■ To survive summary judgment, plaintiff must show "that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 923 (10th Cir.2001) (quotations omitted). Such hostility or harassment must be based upon plaintiff's protected class, such as race or national origin. *See Bolden v. PRC Inc.*, 43 F.3d 545, 551–52 (10th Cir.1994) (affirming summary judgment on hostile work environment and constructive discharge claims where plaintiff failed to establish that he and other employees were singled out for abuse by their coworkers because of their race).

■ Frederickson's statements, whether viewed in isolation or in conjunction with all the other events of which plaintiff complains, fall far short of actionable racial harassment. None of the language used in the article is racially derogatory. Instead, the article merely speaks to plaintiff's having missed class, states why Frederickson believed that a public response to plaintiff's assertions was necessary, and gives numerous reasons in refutation of plaintiff's allegations of racism, including that Frederickson's wife is a Filipino American.

Absent from the record are the traditional indicia of a harassment claim. No evidence of any racial language, racial epithets, or other negative factors which permeate the work place atmosphere has been shown. Although there were rare occasions on which plaintiff's minority status was mentioned by defendants or an outside reviewer, the statements made do not reflect racial animus, and do not collectively approach the level of severity or perva-

siveness necessary for a hostile work environment claim. *See generally Gunnell v. Utah Valley State College,* 152 F.3d 1253, 1265 (10th Cir.1998) (stating Title VII is neither a "general civility code" nor does it make actionable the ordinary tribulations of the workplace.) The same is true for all other statements in the record which allude to race, including but not limited to Hoy's statement as an outside reviewer in 1999, Kautsch's statements in 1995, and Frederickson's statements in February of 1999. The court finds plaintiff raises no genuine issue of material fact as to whether the defendants, or any of them, engaged in prohibited racial harassment.

Section 1983 Due Process Claim

▆▆▆▆▆ Plaintiff alleges that defendants deprived him of due process, but fails to specify whether his claim is of a substantive or procedural deprivation. In either event, plaintiff must show that he possessed a protected property interest in continued employment such that due process protections were necessary. To prove a substantive deprivation, plaintiff must additionally show that defendants deprived him of that property interest in a manner that was either arbitrary or capricious. *See Clinger v. New Mexico Highlands University, Bd. of Regents,* 215 F.3d 1162 (10th Cir.2000); *Ware v. Unified School Dist. No. 492, Butler County, State of Kan.,* 881 F.2d 906, 912–913 (10th Cir. 1989); *Meiners,* 239 F.Supp.2d at 1198.

▆▆▆▆▆ Tenured professors have a property interest in continued employment. *See Tonkovich v. Kan. Bd. Of Regents,* 159 F.3d 504, 517 (10th Cir.1998). But professors who are not tenured and who are at-will employees do not have a legitimate claim of entitlement to their reappointment absent a specific contractual guarantee to that effect, under Kansas law. *See Meiners,* 239 F.Supp.2d at 1198. The record fails to show that plaintiff, a non-tenured professor, had any contractual agreement to be reappointed, thus he had no property interest in his position.

But even assuming plaintiff had a property interest in continued employment with KU, there is no evidence in the record that the deprivation of any property interest was either arbitrary or capricious. Accordingly, plaintiff has not raised a genuine issue of material fact on any due process claim.

Qualified Immunity

▆▆▆▆▆ Defendant asserts that the individual defendants are entitled to qualified immunity. This doctrine shields government officials from personal liability under 42 U.S.C. § 1983 "unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Baptiste v. JC Penney Co., Inc.,* 147 F.3d 1252, 1255 (10th Cir.1998) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Where the defense of qualified immunity is raised, the first step in analyzing plaintiff's 42 U.S.C. § 1983 claim "is to identify the exact contours of the underlying right said to have been violated." *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998). "Where a plaintiff fails to demonstrate that a defendant's conduct violated the law, [the court] need not reach the issue of whether the law was clearly established." *Barney v. Pulsipher,* 143 F.3d 1299, 1309 (10th Cir. 1998).

▆▆▆▆▆ The court has concluded above that plaintiff's allegations fail to raise a material question of fact that he suffered a constitutional deprivation at the hands of defendants. Accordingly, the court declines to address the second prong of defendants' qualified immunity defense.

IT IS THEREFORE ORDERED that plaintiff's motion for summary judgment

or partial summary judgment (Dk.183) is denied; that defendant's motion for summary judgment (Dk.192) is granted; that defendant's motion for leave to substitute corrected memorandum (Dk.196) is granted; that defendant's motion to strike plaintiff's affidavit (Dk.199) is granted in part and denied in part; and that plaintiff's motion for leave to file a surreply (Dk.208) is granted.